# In the United States Court of Federal Claims

Case No. 09-265C & 09-882C
FOR PUBLICATION
Filed: October 31, 2011

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
EXXON MOBIL CORPORATION,            *       Shell Oil Co. v. United States, 93
                                    *       Fed Cl. 441 (Fed. Cl. 2010);
               Plaintiff,           *       "Avgas;" "history of the Petroleum
                                    *       Administration for War;" "Charges;"
v.                                  *       First War Powers Act of 1941;
                                    *       Executive Orders 9001, 9024;
                                    *       Anti-Deficiency Act, Pub. L.
THE UNITED STATES,                  *       No. 59-28, 34 Stat. 27, 49 (1906);
                                    *       Defense Supply Corporation
               Defendant.           *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Daniel M. Steinway,* with whom was *William S. Foster, Jr.*, Baker Botts LLP, Washington D.C., for Plainitff.

*Kenneth Woodrow*, Trial Attorney, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for Defendant.

## OPINION and ORDER

**SMITH, Senior Judge.**

During World War II, the United States required massive quantities of 100-octane aviation gasoline ("avgas") for use in airplane engines. The Government considered avgas to be a "superfuel" that allowed airplanes to fly with more power, speed, quicker take-off, and was essential to victory in combat. The critical need for avgas prompted the Government to order oil refineries to maximize its production, which resulted in the Government contracting with Plaintiff's Baytown and Baton Rouge refineries for the production and supply of avgas.

1

The Baytown and Baton Rouge refineries supplied avgas to the Government during World War II under the operation and ownership of ExxonMobil's predecessor companies. The refineries produced excessive amounts of avgas for the Government, which resulted in waste and other by-products of the petroleum refining process. ExxonMobil is currently incurring the costs associated with cleaning the areas surrounding the Baytown and Baton Rouge refineries. Due to the waste and cleanup costs, the question before the Court is whether the avgas contracts between the Government and the Baytown and Baton Rouge refineries cover ExxonMobil's cleanup costs. The court holds that the Government is liable for the cleanup costs. In light of this, the Court hereby **GRANTS** Plaintiff's Motion for Partial Summary Judgment and **DENIES** Defendant's Cross-Motion of Summary Judgment.

# I. Facts[1]

## A. The Avgas Refineries

ExxonMobil currently owns and operates two oil refineries and chemical plants in Baytown, Texas ("Baytown complex") and in Baton Rouge, Louisiana ("Baton Rouge complex"). During World War II, the Baytown complex operated as an oil refinery, owned by ExxonMobil's predecessor company, Humble Oil & Refining Company ("Humble"). The Baton Rouge complex also functioned as an oil refinery and was owned and operated by Standard Oil ("SOL"), also a predecessor company of ExxonMobil.

Under the authority of the Defense Supply Corporation ("DSC"), the Baytown and Baton Rouge refineries produced avgas for the Government during World War II. On August 16, 1940, the Government chartered the DSC with the power to "produce, acquire and carry critical and strategic materials, including particularly 100 octane gasoline." On November 17, 1941, the DSC was approved to purchase all avgas produced, including avgas produced at the Baytown and Baton Rouge refineries.

## B. The Contracts

During the course of World War II, the DSC entered into three avgas contracts with Humble's Baytown refinery and SOL's Baton Rouge refinery.[2] In January of 1942, the DSC entered into a contract for the sale of avgas ("Master Avgas Suppliers Contract") with the Standard Oil Company of New Jersey ("SONJ"). The Master Avgas Suppliers Contract

---

[1] Unless otherwise stated, the following facts and procedural history, which are not in dispute, can be found in the Plaintiff's Proposed Findings of Uncontroverted Facts in Support of its Motion for Partial Summary Judgment and the Defendant's Proposed Findings of Uncontroverted Facts in Support of its Cross-Motion for Summary Judgment.

[2] The DSC and SONJ amended their original contract on May 15, 1944, which does not affect the "Taxes" clause. *See* D. Proposed Facts at 11 ¶ 44.

continued through February 28, 1946 and provided that the Baytown and Baton Rouge refineries would act as "suppliers" of avgas for SONJ.

The DSC entered into a second avgas contract on February 4, 1942, with Humble's Baytown refinery ("Baytown Avgas Contract"). The Baytown Avgas Contract reiterated that Baytown supplied avgas to the Government and would make "direct sales" of avgas to the DSC. On February 16, 1943, the DSC entered into a similar contract with the Baton Rouge refinery ("Baton Rouge Avgas Contract"), which provided for the Baton Rouge refinery to sell avgas directly to the United States, subject to the terms of the Master Avgas Suppliers Contract.

The Master Avgas Suppliers Contract, Baytown Avgas Contract, and Baton Rouge Avgas Contract (collectively the "Avgas Contracts") contained 16 numbered sections. The pertinent section for this opinion is Section XII, or the "Taxes" clause in which the Government agreed to pay:

> [A]ny new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [avgas].

The contracts also contained provisions in which the Government agreed to bear the risk of increased costs in the production of avgas, unless the Government was willing to accept reduced production.

C.  **Post-Production Clean Up**

The production of avgas pursuant to the Avgas Contracts resulted in "by-products of petroleum in various forms, caught as the crude oil goes through the refinery in process of being broken down in its parts, purified and concentrated." September 1, 1943 Report of the Petroleum Administration for War on the 100 Octane Aviation Gasoline Program at 49.

In February 1987, the Louisiana Department of Environmental Quality ("LDEQ") issued a Corrective Action Order directing ExxonMobil to conduct environmental cleanup at the Baton Rouge refinery. On March 15, 1995, the Texas Natural Resources Conservation Commission, predecessor to the current Texas Commission on Environmental Quality (collectively "TCEQ") issued an Agreed Order instructing ExxonMobil to clean up numerous solid waste management units ("SWMUs") and other contaminated areas at the Baytown refinery. ExxonMobil has since incurred environmental cleanup costs.

Pursuant to 41 U.S.C. § 114(a), ExxonMobil submitted documents to the U.S. General Services Administration ("GSA") with respect to the Avgas Contracts for reimbursement of environmental cleanup costs incurred in the performance of the contracts. The GSA has not

responded to the claims or otherwise reimbursed ExxonMobil for the cleanup costs set forth in the documents, prompting Plaintiff to bring action in this Court.

## II. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Genuine issues of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Id.* at 248. The non-movant must establish the existence of a material element on which movant bears the burden of proof. *Celotex*, 477 U.S. at 324. The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Anderson*, 477 U.S. at 242.

Defendant argues that Plaintiff's Motion for Partial Summary Judgment must be denied because it contains genuine issues of material fact requiring further discovery. Conversely, Defendant argues that its Cross-Motion for Summary Judgment should be granted because it requires no further discovery. Defendant asserts that the unknown amount of waste attributable to the avgas production prevents this Court from confirming that a causal link exists between the avgas production and the waste. Hence, this genuine issue of material fact prevents this Court from granting Plaintiff's Motion for Partial Summary Judgment. The Court does not agree. The Government has previously conceded that the production of avgas results in by-product waste. Therefore, this claim is ripe for summary judgment, as the only question of fact that remains for the Court is assessing damages.

## III. Discussion

Before this Court is the question of whether the Government breached its contract with ExxonMobil by refusing to reimburse ExxonMobil for environmental response charges incurred due to avgas production. To answer this question, this Court must determine whether the "Taxes" clause of the Avgas Contracts holds the Government liable for environmental response costs incurred by the performance of the contract.

Plaintiff argues that Defendant is liable for the costs because this Court has previously held that the term "charges" in the "Taxes" clause includes environmental cleanup costs. Pl. Motion at 4; *Shell Oil Co. v. United States*, 93 Fed. Cl. 439 (Fed. Cl. 2010). *Shell* involved a contract between the Government and Shell Oil Co. for the production of avgas during World War II. *Shell,* 93 Fed. Cl. at 441. The language of the contract contained the identical "Taxes" clause as found in the Avgas Contracts, and this Court ruled in *Shell* that the term "charges," as

4

understood by its plain meaning, includes costs incurred due to post-production environmental cleanup. *Id.* at 444.

Defendant counters that the Government is not liable for the cleanup costs with the same four arguments it raised in *Shell*. First, Defendant asserts that the plain meaning of the term "charges" in the "Taxes" clause should not be reasonably construed to include costs incurred due to environmental responses to avgas production. D. Reply at 4. In part, Defendant's assertion that such interpretation is unreasonable hinges on its second argument that the environmental response costs lack a temporal nexus to the contract. D. Reply at 6. Defendant states that interpreting the "Taxes" clause to include unforeseen costs incurred decades after the performance of the contract leads to "open-ended indemnity" and violates the established principles of contract interpretation. D. Reply at 10. Consequently, Defendant contends that the Government's liability does not continue indefinitely, but covers costs incurred *during* the performance of the contract. D. Reply at 10.

This Court has already addressed each of these arguments in *Shell*. Specifically, this Court held that "the plain language of the ["Taxes"] clause does not limit reimbursement to costs imposed only during contract performance" and the timing of the cleanup charges has no bearing on the Government's liability to cover costs that are causally related to avgas production. *Shell Oil Co.*, 93 Fed. Cl. at 445. Defendant argues that the unknown quantum of waste resulting from the avgas production distinguishes the case from *Shell* in which the parties stipulated to all the facts. Here, the uncalculated amount of waste prevents the Court from concluding that the waste was produced "by reason of" the avgas. This argument is disingenuous because the Government has acknowledged that avgas production creates waste and was aware of such a consequence at the time of the Avgas Contracts.[3] The question of fact concerning the amount of waste attributable to avgas production has no bearing on the determination that the Government is liable for avgas cleanup costs. The parties must pursue discovery to confirm to what extent, if any, the causal link between avgas production and the cleanup costs exists, but the unknown quantum of waste attributable to the avgas production does not prevent this Court from holding that the Government is held liable for the resulting costs attributable to avgas production.

Last, Defendant asserts that the Anti-Deficiency Act ("ADA") bars the term "charges" from encompassing environmental cleanup costs. D. Reply at 12. The relevant provision of the ADA in effect during WWII states:

> No Executive Department or other Government establishment of the United States shall expend, in any one fiscal year, any sum in excess of appropriations made by

---

[3] September 1, 1943 Report of the Petroleum Administration for War on the 100 Octane Aviation Gasoline Program at 49. The report explains that the avgas production process results in various by-products that could not be recycled for other purposes because all production was focused solely on avgas.

Congress for that fiscal year, or involve the Government in any contract or obligation for the future payment of money in excess of such appropriations *unless such contract or obligation is authorized by law.*

Pub.L. No. 59-28, 34 Stat. 27, 49 (1906). Plaintiff argues that the First War Powers Act, when read together with Executive Order 9024,[4] constitutes a waiver of the ADA. Pl. Motion at 31-32; *Cadillac Fairvew/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019 (9th Cir. 2002).

Defendant asserts that the Executive Order 9024 must be interpreted in light of the preceding Executive Order 9001 that incorporated the ADA's limitations, thus barring reimbursement for the environmental cleanup costs. D. Reply at 12. In *Shell*, this Court previously held that Executive Order 9001 and the War Powers Act "authorized open-ended indemnification agreements" and consequently allow reimbursement charges. *Shell*, 93 Fed. Cl. at 447-48. In accordance with this interpretation of the Executive Orders 9001 and 9024, this Court again holds that the ADA does not bar the Plaintiff from seeking reimbursement for the cleanup costs.

ExxonMobil entered into the Avgas Contracts with the Government to facilitate the war effort, and the Government's need for excessive amounts of avgas prompted the Government to insure ExxonMobil's production costs. The facts of the case follow in the footsteps of *Shell* in which this Court previously decided the issues now raised again by the Defendant. Although this Court considered CERCLA in *Shell*, whereas this case concerns state law, the facts and analysis are the same and prompt this court to follow its holding in *Shell*. As in *Shell*, the very purpose of the contract clauses at issue was to remove the potential risks any reasonable producer would be reluctant to take on. To now argue that the guarantee was very limited in time while the risks are now doing damage is inconsistent with the whole purpose of the clause. It also ignores the plain language of the clause.

## Conclusion

For the reasons set forth above, the Court hereby GRANTS Plaintiff's Motion for Partial Summary Judgment and DENIES Defendant's Cross-Motion for Summary Judgment.

**It is so ORDERED.**

s/ Loren A. Smith
LOREN A. SMITH,
Senior Judge

---

[4] Executive order 9024 established the broad powers of the War Production Board to "[d]etermine the policies, plans, procedures, and methods" of war procurement and production contracts. Exec. Order No. 9024 ¶ 2(b).